Filing # 48361629 E-Filed 11/01/2016 03:18:27 PM

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

ROBERT "BUD" ROOT,

    Plaintiff,

v.                                      CASE NO.:

NEW COUNTRY MOTOR CARS OF PALM BEACH, LLC
d/b/a FERRARI OF PALM BEACH
and NEW COUNTRY MOTOR CAR GROUP, INC.,

    Defendants.
_____/

## COMPLAINT
### (JURY TRIAL DEMANDED)

Plaintiff, Robert "Bud" Root by and through counsel, herein sues Defendants, New Country Motor Cars of Palm Beach, LLC d/b/a Ferrari of Palm Beach ("FPB") and New Country Motor Car Group, Inc. ("NCMG") (collectively "Defendants") and alleges:

1. This is an action for damages exceeding $15,000, exclusive of interest, costs, and attorneys' fees, for violation of the Age Discrimination in Employment Act of 1967, as amended.

2. Plaintiff is a resident of Palm Beach County, Florida.

3. NCMG is a foreign entity doing business in Palm Beach County, Florida, though not authorized to do business in Florida. NCMG is a $2 billion a year privately owned company based in Saratoga Springs, N.Y., with approximately 35 automobile dealerships throughout the United States, including, Ferrari, Maserati, Mercedes Benz, BMW, Audi, Porsche, Lexus, Toyota, and many others.

Exhibit 2 - Original Complaint

4. FPB is a Florida LLC doing business in Palm Beach County, Florida.

5. At all times material, Plaintiff was a dual employee of NCMG and FPB.

## JURISDICTION AND VENUE

6. Personal jurisdiction over NCMG exists in accordance with §§48.193(1)(a) and (b), Fla. Stat., in that at all times pertinent hereto, NCMG operated, conducted, engaged in, or carried on a business in Florida and maintained offices and/or agents in Florida, and committed tortious acts within the State of Florida which are the subject of these proceedings. Personal jurisdiction also exists over NCMG in accordance with §48.193(2), Fla. Stat. as a result of NCMG'S engaging in substantial and not isolated activity within the State of Florida.

7. NCMG has sufficient minimum contacts with the State of Florida such that it should reasonably anticipate being hailed into court here in that NCMG maintains, operates, and manages vehicle dealerships throughout the State of Florida and directs its activities in Florida by contracting with individuals domiciled in Florida and routinely engages in business with Florida residents.

8. Venue is proper in Palm Beach County as it is the County in which the conduct complained of arose, and in which Defendants maintain, operate, and manage the vehicle dealership at which Plaintiff was and, again, is employed.

*Root v. New Country*                                           Case No.:
Complaint                                                        page 3

## FACTUAL BACKGROUND

9. Plaintiff is a 71 year old gentleman, who loyally devoted the past 22 years of his life to the Ferrari brand as a Ferrari salesperson.

10. Plaintiff, though he has had a successful career in the Ferrari industry, has remained modest and unpretentious. While he sells million dollar Ferraris, Plaintiff still drives a Honda from the 1980s which Plaintiff insists he will drive for another 100,000 miles.

11. Any customer who has had the pleasure of purchasing a Ferrari through Plaintiff can confirm that integrity and honesty are truly the hallmarks of his character and career. Plaintiff's sterling reputation boldly stands out against the backdrop of the less than lustrous reputation often associated with the auto sales industry. Plaintiff's reputation has enabled him to develop a large and loyal client base which has resulted in many repeat Ferrari purchases over the years, and is the source of many first-time Ferrari purchase referrals.

12. Plaintiff's career as a Ferrari salesperson began in 1994 when he joined Tom and Steve Shelton in their Ferrari dealership in Ft. Lauderdale ("Shelton Ferrari"). Tom Shelton was Plaintiff's college roommate at the University of Miami where he and Plaintiff were also fraternity brothers in Sigma Ki. Plaintiff graduated with a degree in Chemistry.

13. Throughout his 15 years of employment at Shelton Ferrari, Plaintiff established business relationships with some of the most prominent and affluent Ferrari aficionados in Florida and throughout the country.

*Root v. New Country*  
Complaint

Case No.:  
page 4

14. In 2009, Tom and Steve Shelton sold their Ferrari dealership.

15. Later that year, Plaintiff was approached by Defendants and solicited to accept employment with Defendants as a salesperson in their newly established Ferrari dealership in West Palm Beach. Defendants were aware that after 15 years in the industry, Plaintiff had become an extremely experienced and knowledgeable Ferrari salesperson who had cultivated a large, loyal, and highly lucrative client following – an asset which Defendants desperately needed to kick-start their fledgling dealership.

16. In October 2009, Plaintiff accepted Defendants' offer.

17. Defendants paid Plaintiff a nominal weekly base salary of $100 and a percentage commission on each vehicle sold. Defendants require their employees to work a minimum of 48 hours per week, although Plaintiff typically works over 58 hours per week. Plaintiff is not paid any hourly wages and works solely on commission. Furthermore, Plaintiff is not paid until a vehicle is fully delivered to the customer. In some instances, this could take more than one year from the date a Ferrari is initially ordered.

18. For the next several years, Plaintiff struggled to make a living at Defendants' dealership due to the fact that Defendants' start-up dealership was allocated very little inventory to sell. Moreover, unlike the Shelton Ferrari dealership where he was previously employed, Defendants initially refused to acquire a used car inventory or allow their salespeople to take in vehicles for resale on consignment. In the Ferrari market, a salesperson generally stands to make greater commissions from the sale of used vehicles due

to wider profit margins as contrasted from new vehicles where the purchase price, and consequential profit margin, is fixed by Ferrari.

19. Despite the dramatic drop in earnings, Plaintiff worked diligently for Defendants, routinely putting in 60 hour plus work weeks, regularly showing up for work on his day off, and rarely taking vacation time. In fact, over the past seven years, while numerous managers, salespersons, and employees at FPB have come and gone, Plaintiff has been the only constant, a customary and familiar face that customers have affectionately been known to refer to as "Mr. Ferrari."

20. By the end of 2015, Plaintiff was generating over two million dollars in annual profits for Defendants, which is about ten times the amount he was paid in commissions.

21. By January 2016, Plaintiff already had approximately 35 deals pending, and on January 29, 2016, Plaintiff sold a used vehicle which he had brought in on consignment, for $1.4 million – the highest used car sale in the history of the dealership.

22. As the deal was closing, instead of congratulating Plaintiff for this accomplishment, Defendants abruptly fired him and escorted him from the dealership as though he were a criminal, all before the eyes of his fellow employees and customers.

23. The reason which Defendants gave for terminating Plaintiff was a false pretext for Defendants' unlawful termination of Plaintiff. In sum, Defendants accused Plaintiff of unethical conduct. Plaintiff had not engaged in any unethical conduct.

24. Defendants' age-based prejudice against Plaintiff, found expression in Plaintiff's outrageous January 29, 2016 unlawful termination, and the creation of a knowingly false reason for the firing.

25. However, Defendants did not anticipate Plaintiff's tenacity in standing up against them for their discriminatory practices. Plaintiff retained counsel, and challenged his firing. In short order, Defendants were forced to admit that the reason they gave for Plaintiff's termination was false.

26. Defendants offered Plaintiff his job back in an attempt to mitigate their exposure for his wrongful termination. Under the preservation of his rights to maintain causes of action against Defendants for their wrongful conduct and based upon certain other assurances from Defendants which, as discussed below, have not been complied with, Plaintiff accepted, and returned to work on March 28, 2016.

27. Since Plaintiff's reinstatement, Plaintiff continues to be the object of overt hostility by Defendants. This takes the form of numerous and varied adverse acts intended to make Plaintiff's daily work intolerable and demeaning. Defendants have engaged in such acts of misconduct in part as retaliation for Plaintiff's initiation of EEOC and FCHR Charges of Discrimination, and as part of an overall strategy by Defendants to force Plaintiff to resign, either voluntarily or constructively, while tarnishing and destroying Plaintiff's reputation and career.

28. It is evident from Defendants' conduct and actions since Plaintiff's reinstatement, that Plaintiff's reinstatement is a ruse, designed to give Defendants a second bite at the apple in order to attempt to fabricate a more plausible pretext to re-fire Plaintiff in the event Defendants are unable to force Plaintiff to resign on his own.

29. In fact, Defendants' general manager, Jay Youmans, is the very personification of Defendants' ongoing hostility towards Plaintiff, exhibited through overt acts of retaliation which they continue to engage in towards Plaintiff and which Youmans falsely attempts to guise as legitimate supervisory functions.

30. By way of example, as recently as June 2016, Defendants, through Youmans, placed a disciplinary memo in Plaintiff's personnel file which accused him of being unresponsive to a customer's call even though Youmans overheard Plaintiff politely remind the customer that he had responded properly. In order to correct the false and unwarranted accusations towards him, Plaintiff was compelled to advise the customer of the incident and submit a written statement from the customer confirming that Plaintiff had, in fact, returned his call. The customer told Plaintiff to tell management that he liked Plaintiff so much that he ordered a brand new Ferrari 488 GTB from Plaintiff. Defendants, however, were not interested in the truth, only in trying to stage a second, more legitimate appearing, termination.

31. In the same disciplinary memo, Youmans also sought to admonish Plaintiff for tossing out a disposable cup of cold coffee which Youmans had left on a counter in full view

of the showroom and customer area. Youmans, whose tenure seems to be degenerating steadily as resignations pile up around him, portrayed the tossing away of the coffee cup as an act of disrespect worthy of discipline.

32. Thus, the lengths of adverse action against Plaintiff have crossed into a bizarre zone of irrationality where Defendants have resorted to false reports of unreturned customer calls and the "unauthorized" disposal of used coffee cups as a basis to harass and retaliate against Plaintiff and, ultimately, provide another false pretext for Plaintiff's eventual *re-termination* by Defendants.

33. Six months prior to Plaintiff's initial termination, Defendants' punitively and discriminatorily removed Plaintiff from the downstairs showroom floor sales office which he had operated out of since the inception of his employment with Defendants and banished him to an upstairs office where he was out of view of the customers.

34. Upon Plaintiff's reinstatement, Defendants continued to refuse to allow Plaintiff to return to a first floor office until just this month.

35. In yet another example of retaliatory conduct, in response to a record preservation request from Plaintiff's counsel, Defendants sent a memo to dealership employees specifically advising them that Plaintiff had filed a Charge of Discrimination with the EEOC and FCHR alleging age discrimination in order to humiliate him.

*Root v. New Country*                                                      Case No.:
Complaint                                                                          page 9

## COUNT I
### *Violation of the Age Discrimination in Employment Act of 1967, As Amended*
### *(Age Discrimination)*

36. Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs, 1 - 35, as if fully set forth herein.

37. Jurisdiction of this action is founded upon 29 USC §626(b) and (c); 29 USC §217; and 29 USC §216(b).

38. At all times material hereto, Plaintiff was a member of the class protected by the ADEA in accordance with 29 USC §631.

39. At all times material hereto, Defendants were engaged in an industry affecting interstate commerce and had twenty (20) or more employees for each working day in each of twenty (20) or more calendar weeks in the then current or preceding calendar year. Defendants were and are an employer within the meaning of Section 11(b) of the ADEA 29 USC §630(b).

40. On February 23, 2016, Plaintiff filed a Charge of Discrimination with the EEOC.

41. More than 60 days has elapsed since the filing of Plaintiff's age discrimination charge with the EEOC.

42. Plaintiff has exhausted all administrative remedies and complied with all conditions precedent prior to bringing this action.

*Root v. New Country*  Case No.:
Complaint  page 10

43. During the course of Plaintiff's employment with Defendants and, more specifically, since the hiring by Defendants of Youmans, Plaintiff was harassed on a routine basis regarding his age and age related abilities and the length of time he has been in the workforce as a Ferrari salesperson.

44. Youmans, an individual 20+ years Plaintiff's younger, would frequently dress-down Plaintiff both privately and in front of other employees and customers suggesting that his age was affecting his job abilities and insinuating that it was time for Plaintiff to retire. One of Youmans' most cherished ways to demean Plaintiff was to comment to Plaintiff in a sarcastic manner and spiteful tone, "you've been at this for a very, very long time."

45. On numerous occasions, Youmans suggested that because of Plaintiff's age, he was incapable of learning the systems and keeping up with the changing technology. Such suggestions by Youmans were made in the context of harassing Plaintiff and inciting him to resign.

46. Six months before Plaintiff's firing, and for the first time in Plaintiff's career, Plaintiff received a Performance Improvement Plan from Youmans falsely giving the impression that Plaintiff was performing inadequately.

47. In reality, however, 2015 was Plaintiff's highest sales year ever, generating over $2 million dollars in sales profits for Defendants, a 60% increase over his prior years' sales profits.

*Root v. New Country*  Case No.:
Complaint                                                                                                   page 11

48. As stated above, at the same time, knowing that it would be more difficult for Plaintiff, who was 70 years old at the time, to go up and down the tall flight of stairs to greet customers, Youmans punitively ordered Plaintiff to leave his office on the ground floor of the main showroom where he had worked for the past six years, and relocate to an obscure second floor office. Plaintiff remained in a second floor office until the day he was fired.

49. Upon Plaintiff's reinstatement, Defendants continued to refuse to allow Plaintiff to return to a downstairs office, even after a first floor office salesperson resigned and Plaintiff requested that he be allowed to relocate to the vacated first floor space.

50. Youmans and other managerial and supervisory employees of Defendants would also make jokes about Plaintiff's age, his supposed forgetfulness, and age related abilities amongst themselves.

51. As stated above, within weeks of Plaintiff initiating complaints for age discrimination with the FCHR and EEOC, Defendants extended Plaintiff "an offer of unconditional reinstatement to his previous position." Just before Plaintiff returned to work, Youmans called a staff meeting at the FPB dealership to announce Plaintiff's return, during which Youmans referred to jokes about Plaintiff's age and his alleged inability to remember things.

52. At the time Plaintiff was fired, Plaintiff was 70 years old and one of the most qualified and top performing salespersons in the dealership.

53. Plaintiff's job was given to a 32 year-old unqualified woman with no vehicle sales experience whatsoever.

54. The reason given by Defendants for Plaintiff's termination was false and was a pretext for Defendants discriminatorily terminating Plaintiff because of his age.

55. The discrimination of Plaintiff was motivated by the intent of Defendants to discriminate against Plaintiff on the basis of his age.

56. The discriminatory intent of Defendants was a significant factor in the adverse employment actions taken against Plaintiff by Defendants, including his termination, the defamations of his character, the redirection of sales business to others, the relegation of Plaintiff to the second floor, the placing of unjustified disciplinary notices in his file in order to harass and embarrass him, the encouragement of rude conduct toward him, and the other acts herein alleged.

57. By discriminating against Plaintiff, Defendants violated the provisions of 29 USC §623(a)(1), which makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's age."

58. Proximately, directly, and as a result of Defendants' discriminating against Plaintiff on account of his age, Plaintiff has suffered damages to his financial welfare and his career including lost income and opportunities, loss of reputation including loss of confidence and goodwill with his customers, and emotional damages in the form of mental anguish and loss of dignity.

*Root v. New Country*  Case No.:
Complaint  page 13

59. Furthermore, Defendants' conduct was unreasonable and outrageous and exceeds the bounds tolerated by decent society, and was done willfully, maliciously, and deliberately, or with reckless indifference or negligence towards Plaintiff so as to also justify the award of punitive and statutory liquidated damages.

60. Plaintiff has complied with all statutory prerequisites and conditions precedent to the maintenance of this cause of action.

61. Plaintiff has retained the undersigned counsel to represent him with respect to his age discrimination claim against Defendants including the underlying EEOC administrative proceeding which was prerequisite to the filing of this action, and has become obligated thereto for a reasonable attorneys' fee, for which Defendants are liable pursuant to 29 USC §216(b).

WHEREFORE, Plaintiff demands judgment for damages against Defendants, jointly and severally, including punitive damages, statutory liquidated damages, attorneys' fees, together with costs, and any and all further relief deemed just, equitable, and proper.

## JURY DEMAND

Plaintiff respectfully demands a jury trial on all issues so triable.

Dated:   November 1, 2016

*Root v. New Country*                                           Case No.:
Complaint                                                           page 14

Respectfully submitted,

PETER J. ALDRICH, P.A.
Co-Counsel for Plaintiff
100 Village Square Crossing
Suite 201
Palm Beach Gardens, FL 33410
Telephone: (561) 775-7797
Facsimile: (561) 775-1075
Email: peter.aldrich@aldrichlaw.net

By: /s/ Peter J. Aldrich
    Peter J. Aldrich
    Florida Bar No. 0340324

WEISMAN, BRODIE, STARR, AND MARGOLIES P.A.
Co-Counsel for Plaintiff
1301 N. Federal Highway
Lake Worth, FL 33460
Telephone: (561) 588-9500
Facsimile: (561) 588-9550
Email: dbrodie@yourfloridacounsel.com
Email: lstarr@yourfloridacounsel.com

By: /s/ David H. Brodie
    David H. Brodie
    Florida Bar No. 0813168

By: /s/ Laura J. Starr
    Laura J. Starr
    Florida Bar No. 0491888